[55 NYS3d 236]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARK BOYD, Appellant.

First Department, June 13, 2017

## APPEARANCES OF COUNSEL

*Marianne Karas*, Thornwood, for appellant.

*Darcel D. Clark, District Attorney*, Bronx (*Emily Anne Aldridge* and *Gina Mignola* of counsel), for respondent.

### OPINION OF THE COURT

Tom, J.

The primary issue raised by defendant on appeal is whether the trial court abused its discretion in granting the People's application to dismiss the count of unlawful possession of an air pistol or BB gun (Administrative Code of City of NY § 10-131 [b]) in an indictment that also included charges of criminal possession of a weapon relating to a 9 millimeter Taurus pistol. Because the BB gun count and the weapon possession counts relating to the Taurus pistol were noninclusory, submission of the BB gun count was not mandatory, and the court reasonably determined that it would "simply provide a distraction or an opportunity [for the jury] to [compromise or] split the difference" (*People v Leon*, 7 NY3d 109, 114 [2006]), a scenario to which defendant was not entitled. Defendant's other arguments are either unpreserved or meritless.

Shortly after 1:00 a.m. on June 8, 2011, while searching for a robbery suspect, Detectives Angelo Tessitore and Ellis DeLoren were driving south on Marion Avenue in the Bronx and spotted defendant holding a gun in each of his hands. Detective DeLoren testified that he had an unobstructed, well lit view of defendant as the unmarked police vehicle approached defendant. As the detectives drew closer, they observed defendant make a throwing motion under a white van parked on the street, and start to walk away. Defendant was standing alone approximately 25 to 30 feet away from a group of people. DeLoren then heard "two clinks hitting the ground."

Defendant was arrested, and the two guns—a black BB gun, or air pistol, and a 9 millimeter Taurus semiautomatic pistol with a brown handle—were retrieved from under the van.

Defendant was charged with criminal possession of a weapon in the second degree, two counts of criminal possession of a weapon in the third degree, criminal possession of a weapon in the fourth degree, and possession of ammunition in connection with his possession of a loaded Taurus pistol. He also was

charged with unlawful possession of an air pistol or rifle based on his possession of the BB gun.

The defense theory at trial was that defendant possessed the BB gun but not the Taurus pistol. To that end, defendant hired a retired detective, John Bruno, who interviewed a witness—Steve Ramsanany—who claimed that he had possessed the Taurus pistol and that he threw it under a car when the police approached. Ramsanany put this statement in writing. However, when the detectives confronted him about his statement he told them that it was a "fake" and a "lie" and that it was defendant's idea. Defendant told him that he would not have to testify and would not get into trouble. When asked why he gave the statement, Ramsanany said he was afraid of defendant, and later sought from DeLoren his assurance that defendant would not learn that he had recanted his statement.

One of defendant's friends, Adan Gil, testified that on the date in question defendant had shown him a BB gun. Gil also claimed that he saw a man he knew as "Harlem" carrying a gun in his waistband that had a brown handle, and that he saw "Harlem" throw the gun under a white vehicle when police arrived.

At the end of the People's case, the court asked whether the People intended to "par[e] down the indictment." The prosecutor stated that he had not made a decision, and asked if defense counsel was going to request submission of the "pellet gun" charge, referring to the charge of unlawful possession of an air pistol, which related to the BB gun. Defense counsel said that he "would like to think about it. You make the decision first." The prosecutor replied, "I think if defense asks for it [sic] he will get it . . . [I]f you know you want it, let me know." Defense counsel said he would do so.

After all of the evidence was presented, defense counsel moved to dismiss the first four counts, relating to the Taurus pistol. He also argued that the "only applicable count" was the air pistol count relating to the BB gun, and asked the court to submit that count to the jury. The People asked the court to deny defendant's motion to dismiss, and stated, "I am not asking you to submit the air pistol, I know you're not hearing argument on that at this point." The court asked whether the People "wish to dismiss it, although defense stated [sic] they're requesting it." The People responded, "[I]t's on the indictment. I guess it's going to be there." The court denied defendant's motion to dismiss the other counts, but did not address the air pistol count further.

The People later moved to dismiss the air pistol count, and defense counsel objected, stating only that "the jury should be allowed to consider that." The court stated that the People "have the option . . . to make that application. And it is not a lesser included, so I don't see there is a legal reason for the [c]ourt to include it . . . and were you to object I would deny it, but it is not." Accordingly, the court granted the People's motion and dismissed the count of unlawful possession of air pistol or rifle.

The jury thus considered one count of criminal possession of a weapon in the second degree and two counts of criminal possession of a weapon in the third degree, all in connection with defendant's possession of the Taurus pistol. Defendant was ultimately convicted of criminal possession of a weapon in the third degree, and sentenced, as a second felony offender, to a term of 2 to 4 years.

Whether to dismiss a count in an indictment is a matter to be decided by the court in its discretion (*People v Extale*, 18 NY3d 690, 692 [2012]). As is the case here, when the offenses are noninclusory, the submission of a less serious count, even if there is evidence to support it, is not mandatory; rather, it is a matter for the trial court's discretion whether to dismiss the count (*People v Leon*, 7 NY3d 109, 113 [2006], *supra*; *see* CPL 300.40 [3] [a] ["With respect to non-inclusory concurrent counts, the court may in its discretion submit one or more or all thereof"]). "In exercising its discretion, the court ha[s] to weigh competing possibilities: Would the submission of the [less serious] count help the jury arrive at a fair verdict, or would it simply provide a distraction or an opportunity to split the difference?" (*People v Leon*, 7 NY3d at 114).

Further, "[d]efendant, in asking for the submission of the less serious charge, was obviously hoping that he could avoid conviction on the more serious one" (*People v Leon*, 7 NY3d at 113-114). Defendant hoped that a jury otherwise prepared to convict him for criminal possession of a weapon in the second or third degree might—"perhaps in an exercise of mercy, or a compromise"—convict him on the unlawful possession of an air pistol instead (*id.* at 114). However, as the Court of Appeals explained in *Leon*, "defendant was not entitled to a chance at jury nullification" (7 NY3d at 114, citing *People v Goetz*, 73 NY2d 751, 752 [1988] [nullification "is not a legally sanctioned function of the jury and should not be encouraged by the court"], *cert denied* 489 US 1053 [1989]).

The court providently dismissed the air pistol charge so that the jury could not compromise by resorting to jury nullification and merely find defendant guilty of that less serious charge. Instead, the jury was given an opportunity to resolve any credibility issues related to the possession of the Taurus pistol. Had the jurors believed defendant's theory of the case that he did not possess the Taurus pistol and disbelieved the People's witnesses, they could have easily acquitted defendant of all charges related to the Taurus pistol. Since the count of criminal possession of an air pistol was totally unrelated to the weapon charges, it could only confuse the jurors or permit jury nullification during jury deliberations.

Stated another way, defendant was not prejudiced by the dismissal of the air pistol count. Once the People presented their case concerning the possessory counts of the Taurus pistol, defendant's theory of the case that he did not possess the firearm was considered by the jury. Clearly, if the jurors determined that defendant only possessed the BB gun, they could return a complete acquittal. Nor is it correct to state, as does the dissent, that dismissal of the air pistol count "removed defendant's only defense from consideration." The fallacy of this argument is that the charge of criminal possession of an air pistol, a misdemeanor, is a distinct and completely separate crime and, thus, cannot serve as a defense to the charge of possession of the 9 millimeter pistol. It would appear that the only reason to give both counts to the jury is to allow the jury to exercise mercy, or a compromise, to find defendant guilty only of criminal possession of the air pistol. Once again, no defendant is entitled to jury nullification. Further, defendant's defense that he did not possess the Taurus pistol was considered, and rejected, by the jury. The jury's finding defendant guilty of possession of the Taurus pistol count was based on the evidence presented by the People, including the credibility of their witnesses, and not for the reason that the air pistol count was dismissed.

In any event, whether or not defendant possessed a BB gun had no bearing on the jury's consideration of the counts relating to the Taurus pistol. Rather than be distracted by the issue of the BB gun, the jury was able to focus its deliberative energies on whether the People had proven beyond a reasonable doubt the elements of the counts relating to the Taurus pistol.

Contrary to the dissent's contention that submission of the air pistol count would have "helped the jury arrive at a fair

verdict," the jury was free to credit the defense without regard to whether defendant was charged with the air pistol count. To the extent the dissent notes that the defense was supported by defendant's and Gil's testimony, as well as by Ramsanany's declaration, the dismissal of the air pistol count did not, in any manner, preclude the jury from crediting the defense and acquitting defendant of the charges related to the Taurus pistol.

Nor was it unfair for the jury to hear about Ramsanany's declaration and DeLoren's rebuttal of it. In particular, Ramsanany claimed that he had possessed the Taurus pistol and that he threw it under a car when the police approached. DeLoren rebutted that claim by stating that Ramsanany had admitted to him that his statement was a lie. The dissent mischaracterizes this testimony as "essentially tell[ing] the jury to forget about that testimony and focus only on the 9 millimeter Taurus pistol." The jury was not told or urged to "forget about that testimony," as the dissent says. Rather, the jury was entitled to credit Ramsanany's declaration or not in deciding whether Ramsanany possessed the Taurus pistol. The jury obviously rejected Ramsanany's statement and credited the testimony of Detective DeLoren. The jury's request for a readback of Bruno's testimony about his conversations with Ramsanany does not indicate any confusion on its part, particularly since the court had already instructed the jury that all submitted counts were related only to the Taurus pistol.

Similarly, while Gil's testimony mentioned defendant showing Gil a BB gun, Gil also stated that he had seen another individual with a gun that matched the description of the Taurus pistol. Thus, his testimony was fairly received and did not unfairly confuse the jury.

There is no basis on which to conclude, as defendant does, that the jury convicted defendant of criminal possession of a weapon in the third degree, and not the top count, because it had to convict him of "something or nothing at all," and could not convict him on the air pistol count. While the conviction on the lowest charge submitted to the jury could have been a show of mercy, "[t]o speculate why the jury voted as it did, is at best, an exercise in futility" (*People v Davis*, 92 AD2d 177, 185 [1st Dept 1983], *affd* 61 NY2d 202 [1984]). Moreover, defendant failed to preserve this particular argument for review.

Defendant further argues that the jury's verdict was against the weight of the evidence because, inter alia, DeLoren was the only witness who saw defendant holding the guns, and his

testimony was purportedly undermined by other testimonial evidence. The verdict was not against the weight of the evidence (*see People v Danielson*, 9 NY3d 342, 348-349 [2007]). There is no basis for disturbing the jury's credibility findings. DeLoren's account of the recovery of the weapon from defendant was found credible by the jury, and his testimony was not undermined by that of Detective Tessitore, whose testimony was similar to DeLoren's. Moreover, there is also support in the record for the jury's determination to credit DeLoren's testimony over Ramsanany's statements, particularly since Ramsanany did not testify in court, recanted his statement, and admitted to DeLoren that he was afraid of and/or influenced by defendant.

Defendant also argues that certain evidentiary rulings denied him a meaningful opportunity to present a defense. Some of these issues are unpreserved, and all are unavailing.

Ramsanany initially told defense investigator Bruno that he had thrown the Taurus pistol under the van. He later recanted and told DeLoren that defendant had asked him to sign a false statement. At the time of defendant's trial, Ramsanany was in federal custody on charges of possession of an AK-47. The court denied defendant's request to admit evidence of those pending charges.

Defendant argues that evidence of Ramsanany's recantation and of his fear of defendant should not have been admitted. However, the issue was waived by defense counsel's consent to the admission of that evidence in the event that he introduced Ramsanany's initial inculpatory statement. Regardless, it was properly admitted, since it would be misleading to admit only hearsay evidence of the initial inculpatory statement. Moreover, defense counsel was able to cross-examine DeLoren and elicit facts to undermine his claims regarding Ramsanany's recantation.

As for Ramsanany's arrest for possession of an AK-47, the court correctly excluded that evidence because Ramsanany had not been convicted of any crime, and "the mere fact of an arrest is not a permitted area for impeachment" (*People v Randolph*, 122 AD3d 522, 522 [1st Dept 2014], *lv denied* 25 NY3d 953 [2015]).

There is no merit to defendant's contention that the court did not allow DeLoren to be fully questioned regarding his authority to arrest Ramsanany for his purported possession of the Taurus pistol if he did not recant his prior admission.

Defense counsel was able to ask a number of questions on the topic and there is no indication that the court unfairly limited his inquiry.

Defendant also takes issue with the court's *Sandoval* ruling. At the *Sandoval* hearing, the People sought to admit evidence of two prior "narcotics-related" felony convictions, without going into the underlying facts of the drug sales. They also wanted to ask whether defendant was on parole at the time of the conduct at issue.

The court ruled that the People could inquire about one felony conviction and its underlying facts. The court stated, incorrectly, that that was the compromise the People had proposed. The court also ruled that the People could inquire whether defendant was on parole because credibility was "essential" in the case.

The court's *Sandoval* ruling balanced the appropriate factors and was a provident exercise of discretion (*see People v Walker*, 83 NY2d 455, 458-459 [1994]). The court permitted limited inquiry into matters that were relevant to credibility. Although the court's ruling allowing inquiry into the underlying facts of one prior drug conviction was more than the People had requested, it excluded another drug conviction altogether.

Defendant's claims that the prosecutor engaged in certain instances of trial misconduct are unpreserved and unavailing. First, defendant argues that the prosecutor knowingly elicited perjury from DeLoren, when DeLoren stated that he saw defendant with two guns rather than one. However, there is no record evidence to support this claim. As for defendant's complaint that DeLoren interviewed Ramsanany despite a conflict of interest, the jury properly credited DeLoren's testimony in light of the circumstances of Ramsanany's initial statement. Nor does it avail defendant to note that the prosecution failed to test the gun for fingerprints or DNA.

Defendant's argument that the prosecutor denigrated the defense by insinuating that defense investigator Bruno was "in cahoots" with defense counsel or defendant is unpreserved. The prosecutor asked Bruno whether he was being paid by defense counsel or defendant. Defense counsel objected to that question, and the court sustained the objection. Defendant did not seek any further relief.

In any event, defendant was not harmed, because Bruno only stated that he would be paid at the end of the case when

he "submit[ted] a voucher to the judge." The prosecutor also acknowledged, "There is nothing wrong with that, you're working. This is your job, correct?"

Defendant also failed to preserve his claim that, during their summation, the People impermissibly shifted the burden of proof to the defense by arguing that defendant had failed to produce Ramsanany, that there were numerous questions to which the prosecutor did not "know the answer," and on which the "[s]ilence is deafening." In fact, defense counsel did not object to any of these comments.

Further, when the prosecutor commented that Ramsanany had said that defendant had told him he would not have to testify, and in fact, he did not testify, defense counsel objected. The court overruled the objection, but it instructed the jury that it would later deliver "a full charge [that] the defendant does not have to prove anything." The prosecutor's comment, either standing alone or combined with the other comments defendant cites, did not amount to conduct so pervasive and egregious that it deprived defendant of a fair trial (*see People v D'Alessandro*, 184 AD2d 114, 118-119 [1st Dept 1992], *lv denied* 81 NY2d 884 [1993]). Moreover, the court reminded the jury that the defense did not have to prove anything, alleviating any prejudice to the defense.

Defendant contends that he was deprived of his due process right to the effective assistance of counsel by his trial counsel's failure to request admission of his out-of-court post-arrest statement admitting possession of the BB gun and denying possession of the Taurus pistol in order to rebut the People's argument that the defense was a recent fabrication.

Initially, we find that this ineffective assistance claim is unreviewable on direct appeal because counsel may have had strategic reasons for his conduct that are not apparent from the trial record (*see People v Love*, 57 NY2d 998 [1982]). For example, admission of the statement might have opened the door to admission of more of defendant's testimony at the *Settles* hearing, which includes references to his criminal record. Defendant had also named someone named "Billy" or "Bills" as having the Taurus gun, and thus his prior statement would have served only to contradict Ramsanany's statement that he possessed the gun and Gil's testimony that someone named "Harlem" had the gun, and would not have rebutted the contention that they had recently fabricated their statements.

As an alternative holding, we reject defendant's ineffective assistance claim on the merits (*see People v Benevento*, 91 NY2d

708, 713-714 [1998]; *see also Strickland v Washington*, 466 US 668 [1984]). Even if defense counsel asked to introduce evidence of defendant's statement as a prior consistent statement to rebut a charge of recent fabrication, it had little chance of success. While a witness's own prior consistent statement may be admitted, we note that defendant did not testify and thus could not be cross-examined (*see People v McDaniel*, 81 NY2d 10, 18 [1993] [prior consistent statements may be admitted because "it would be unjust to permit a party to suggest that a witness . . . is fabricating a story without allowing the opponent to demonstrate that the witness had spoken similarly even before the alleged incentive to falsify arose"]). Accordingly, defense counsel would have had to successfully argue that he could elicit evidence of that statement through Detective DeLoren's testimony. It should be noted that DeLoren had failed to make a complete written report as to what defendant told him. In sum, this error, standing alone, based on the trial record, does not warrant a finding of ineffective assistance.

Accordingly, the judgment of the Supreme Court, Bronx County (Efrain Alvarado, J.), rendered December 18, 2013, as amended February 26, 2014, convicting defendant, after a jury trial, of criminal possession of a weapon in the third degree, and sentencing him, as a second felony offender, to a term of 2 to 4 years, should be affirmed.

ACOSTA, P.J. (dissenting). In my opinion, the trial court abused its discretion in refusing to submit the air pistol charge to the jury (*see* Administrative Code of City of NY § 10-131 [b]). On June 8, 2011, at around 1:15 a.m., two detectives were searching for a robbery suspect. As they approached a group of people near 195th Street in the Bronx, Detective Tessitore slowed the car down to five miles per hour, to see whether the suspect was among the group.

As the car slowed, Detective DeLoren saw defendant standing on the east side of the street, to DeLoren's left (on the driver's side of their car), four to five feet away, facing the street, with a gun in each hand. Defendant was looking down at the guns. Defendant was standing separate from the group, roughly 25 to 30 feet away from anyone else.

The area was well lit by street lights, and DeLoren had an unobstructed view of the guns. DeLoren and Tessitore testified that as DeLoren looked to his left, out of Tessitore's side of the car, he told Tessitore, "Stop, stop . . . gun, gun, guy has a gun, back up, back up."

DeLoren looked over his shoulder, and defendant looked at him as Tessitore backed up the car. Defendant turned, made a throwing motion under a white van parked on the street, and started to walk away. DeLoren did not see the guns go under the van, but he heard "two clinks hitting the ground." Tessitore was watching the road, so he did not see defendant holding any guns as he drove.

The detectives got out of the car and went to different sides of the van. Defendant was on the sidewalk by the van, 10 to 12 feet from where he had thrown the guns. There were people near a building 20 to 30 feet away from where defendant had thrown the guns and 15 feet from where detectives had stopped him. DeLoren arrested defendant and then retrieved the two guns from under the van.

DeLoren described one gun as a black BB gun, or air pistol, and the other as a 9 millimeter Taurus semiautomatic pistol with a brown handle. The 9 millimeter pistol was loaded and found to be operable. The air pistol also was found to be operable. The guns were not tested for DNA or fingerprints, but DeLoren explained that the police gather that evidence only when the suspect's identity is unknown.

The court held a *Settles* hearing, at which retired NYPD Homicide Task Force Detective John Bruno, DeLoren, and defendant testified, in order to determine the trustworthiness and reliability of Ramsanany's statement, a declaration against penal interest (*see People v DiPippo*, 27 NY3d 127 [2016]; *People v Settles*, 46 NY2d 154 [1978]). After the hearing, the court granted defendant's request to introduce Ramsanany's declaration, and, with defendant's consent, also allowed the People to introduce evidence of Ramsanany's recantation.

Defendant presented evidence at trial that he possessed only the air pistol, and that someone else had possessed the pistol before police retrieved both weapons from under a van. Bruno, who had been working as a private investigator since 1985, was hired by the defense in connection with the instant matter. Defendant asked Bruno to talk to a man named "Steve," whose last name Bruno later learned was Ramsanany. On August 7, 2012, Bruno met Ramsanany at defendant's apartment, with the understanding that Ramsanany was going to admit that he possessed the gun at issue. Bruno did not, before interviewing Ramsanany, know what kind of gun was involved. Before interviewing Ramsanany, he told defendant to leave. He also

warned Ramsanany that any admission that he possessed the gun could get him arrested.

Ramsanany then told Bruno that he had been playing dice with people in front of 2650 Marion Avenue, near 197th Street, when a dispute arose between Ramsanany and another player, who slapped Ramsanany. Ramsanany then left and returned with a 9 millimeter Taurus semiautomatic gun, but when an unmarked police car approached, he threw it under a car parked in front of 2650 Marion Avenue. Ramsanany saw defendant throw a BB gun under the car. As police approached, Ramsanany left. He was not promised anything for making the statement, which Bruno put in writing and Ramsanany signed.

Adan Gil, one of defendant's friends, also testified on defendant's behalf. At 1:00 a.m. on June 8, 2011, defendant was sitting on a stoop near 2654 Marion. Some people were playing dice nearby, and an argument started between a man Gil knew as "Harlem" and another man. The other man slapped Harlem, who then left, and returned. When Harlem returned, he had a brown gun handle sticking out of his waistband. As Gil heard the police arrive, he saw Harlem throw the gun under a white vehicle. Gil left when he saw the police arrive. He had not paid attention to what defendant was doing at the time. Earlier that day, defendant had shown him a BB gun.

In rebuttal, Detective DeLoren testified that on March 3, 2013, he, Tessitore, and another detective visited Ramsanany's house, after he had been unwilling to speak to them by phone. They found Ramsanany a block away from his house. When DeLoren confronted Ramsanany about his written statement, Ramsanany "put his head down and sighed heavily." He admitted that it was a "fake" and a "lie" and that it was defendant's idea. Defendant had told Ramsanany that if he agreed to say that he had the 9 millimeter Taurus, the case would be dismissed, Ramsanany would not have to testify, and he would not get in trouble. When DeLoren asked why Ramsanany gave the statement, Ramsanany said he was afraid of defendant. DeLoren did not believe that he had the authority to arrest Ramsanany at that point. A few weeks later, Ramsanany called DeLoren and sought assurance that defendant would not learn that Ramsanany had recanted his statement to DeLoren. DeLoren had not taken notes of that conversation, including when it occurred.

At the end of the case, defendant moved to dismiss the charges relating to the 9 millimeter Taurus pistol, and argued

that only the air pistol count should be charged. The People moved to dismiss the air pistol count, and defense counsel objected, stating, "[T]he jury should be allowed to consider that." The court stated that the People "have the option . . . to make that application. And it is not a lesser included, so I don't see there is a legal reason for the [c]ourt to include it . . . and were you to object I would deny [the People's motion], but it is not." Accordingly, it granted the People's motion and dismissed the count of unlawful possession of air pistol or rifle.

The court submitted three counts for the jury's determination, criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]), criminal possession of a weapon in the third degree (Penal Law § 265.02 [1]), and criminal possession of a weapon in the third degree (Penal Law § 265.02 [5] [ii]). The court also instructed the jury that all the charges referred to the 9 millimeter Taurus and not the air pistol.

In its first jury note, the jury requested a readback of Bruno's testimony regarding his conversation with Ramsanany. Twenty-five minutes later, the jury asked that it be allowed to examine the "two active firearms." Approximately two hours later, it requested "another reading from you [the court] on what the three counts entail—and how they are different." The court recharged the jury on the three counts. It also denied defendant's request that the jury be charged that all three charges referred to the 9 millimeter Taurus pistol.

In my opinion, the court abused its discretion in granting the People's application to dismiss the count of unlawful possession of an air pistol. As a result of the dismissal, the court only submitted the more serious offenses of criminal possession of a weapon in the second and third degrees, relating to possession of the 9 millimeter Taurus pistol, and concomitantly removed defendant's only defense from consideration, namely, that he only possessed the air pistol.

I disagree with the majority's position that submission of the air pistol count "could only confuse" the jury. Indeed, in allowing testimony about Ramsanany's declaration that he, and not defendant, possessed the 9 millimeter Taurus pistol, the court necessarily found that it did not confuse the issues or mislead the jury (see People v DiPippo, 27 NY3d at 135-136 ["a court must determine whether the (declaration against penal interest) is relevant and, if so, whether 'its probative value is

outweighed by the prospect of trial delay, undue prejudice to the opposing party, *confusing the issues or misleading the jury* " (emphasis added)]).

In any event, under the circumstances, submission of the air pistol charge would not have distracted the jury or merely allowed it to reach a verdict based on mercy or compromise; rather, submission of the charge would have helped the jury arrive at a fair verdict if it had credited the defense, a defense supported by defendant's and Gil's testimony and Ramsanany's declaration, as well as the lack of DNA or fingerprint evidence indicating which pistols were in defendant's possession. Instead, because the court dismissed the air pistol count, the jury had no basis on which to convict defendant of possession of only the air pistol, and not the 9 millimeter Taurus pistol, even if it credited the defense, leaving the jury to convict defendant of a more serious offense or acquit him altogether. This was particularly troubling, given that Ramsanany did not testify at trial. Any claims by the prosecution that Ramsanany was coerced by defendant into assuming criminal responsibility for the Taurus pistol could only have been explored through Detective DeLoren. It seems to me patently unfair to provide Ramsanany's declaration and DeLoren's rebuttal to the jury and then essentially tell the jury to forget about that testimony and focus only on the 9 millimeter Taurus pistol.

It should also be noted that this was not a complicated case, such as one with a 30- or more count indictment; it was actually pretty straightforward, that is, did defendant possess both pistols or just the air pistol? However, by allowing defendant to present a defense based on the air pistol, and then taking that defense away just before the jury charge, the jury was understandably confused. In fact, notwithstanding the court's charge that all the counts referred to the 9 millimeter Taurus pistol, the jurors nonetheless asked for a "read-back of [Bruno's] testimony about his conversations with the witness [Ramsanany]." They followed shortly after that with a request to examine both pistols. And when the jurors requested a recharge on the submitted counts, the court denied the defense's request to charge the jury that the counts only referred to the 9 millimeter Taurus.

Accordingly, in my opinion, defendant is entitled to a reversal followed by a new trial (*People v Extale*, 18 NY3d 690, 696 [2012]).

KAPNICK and KAHN, JJ., concur with TOM, J.; ACOSTA, P.J., and GESMER, J., dissent in an opinion by ACOSTA, P.J.

Judgment, Supreme Court, Bronx County, rendered December 18, 2013, affirmed.